LOWENTHAL v. GEORGIA COAST & P. R. CO.

(District Court, S. D. Georgia. July 13, 1916.)

1. RAILROADS ⬤⟲205—RECEIVERS—APPOINTMENT—RIGHT TO APPOINTMENT.

A railroad company which issued bonds for construction purposes defaulted in the payment of interest and its line was in such a precarious condition that it endangered the lives of passengers and trainmen. Taxes to a large sum were unpaid and there were claims for labor and materials. Thereupon a considerable number of the bondholders deposited their bonds with the trustee, giving control to a so-called committee which was authorized to issue obligations which should be prior liens, to dispose of the property and to buy it in, either for themselves or others. The committee, in fact, was given all the powers of a court of chancery, and no steps were taken for the protection of bondholders who would not join. Held that, in such case where the tax liens paid were preserved by the committee paying them, and the property was in a precarious condition, a receiver might be appointed at the suit of a minority bondholder who desired to foreclose the mortgage securing the bonds; the trustee refusing to act.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 673–675; Dec. Dig. ⬤⟲205.]

2. RAILROADS ⬤⟲186—FORECLOSURE OF MORTGAGES—INDISPENSABLE PARTIES.

In such case, where the committee and its depositary were citizens of other districts, and an attempt to join them would imperil the foreclosure suit and proceedings for a receiver, they were not parties indispensable to the appointment of a receiver.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 615, 616; Dec. Dig. ⬤⟲186.]

In Equity. Bill by David Lowenthal against the Georgia Coast & Piedmont Railroad Company. On application for receiver. Receiver appointed.

C. Henry & R. S. Cohen, of Augusta, Ga., and Max Isaac, of Brunswick, Ga., for plaintiff.

Adams & Adams and Hitch & Denmark, all of Savannah, Ga., for defendant.

SPEER, District Judge. [1] The general nature of this case is, perhaps, sufficiently stated in the opinion on the demurrer rendered on yesterday and now of file. The hearing this morning is as to the necessity for a receiver. That the railroad of the defendant company is hopelessly insolvent is undisputed. When the bill was filed, it was indebted to the state and county for taxes in the sum of $5,000 unpaid taxes; for the unpaid wages of laborers and operatives in an amount approximately the same; upon the liens of materialmen and similar liens having priority in the amount of about $15,000. The grand jury of the county of McIntosh, in its general presentments, had recom-

mended that the county officers take energetic action to collect the taxes.

The bonds were issued to construct the railroad in 1912. In that and in each subsequent year the interest thereon was unpaid, and is now in default in the sum of $320,000. A portion of this interest was sought to be refunded by debentures, but the interest on the debentures was also unpaid. After this bill was filed and injunction granted, prohibiting such action, the defendant company obtained from certain bondholders who have entered into a scheme to which reference will be presently made, about the sum of $20,000, with which the taxes and other liens of high priority have been paid. This sum was obtained, however, by issuing additional debentures, which were taken over in New York, and, according to the statement of the comptroller general of the state, the liens thus taken up were deposited with the Railway Developing Company in New York City, and therefore are in full force and effect as prior obligations of the defendant company.

In addition to this, the railway property and particularly the trestle over the Altamaha swamp are shown to be in a condition gravely hazardous to the traveling public. Now one calamity might occur at this point, which, in the damages and loss of life resulting, might destroy or at least largely minimize the security upon which the plaintiff has the right to rely for the payment of his bonds. A far greater danger to that security, however, is to be found in the agreement between a majority of the bondholders of the defendant company or its solicitors and certain persons who term themselves "The Committee," which, if carried into effect, will not only obliterate the property itself, but confiscate the interest of the plaintiff and all others who do not enter into this cause. This provides that the Columbia Trust Company, which was the trustee named in the mortgage for all the bondholders, shall be the depositary under the agreement; that the committee, or the depositary at the request of the committee, may appoint agents to accept the deposit of the bonds, coupons, and funded interest notes, and assist in the performance of any other duty imposed upon the depositary, either by the agreement or by the committee. The securities thus deposited shall be held by the depositary subject to the order of the committee; that neither the depositary, nor the committee, nor its agents shall be held liable for any action taken on account of any mistake, loss, or liability, when such loss or liability of the depositary, or its agents, or the committee, or its agents, caused other than by bad faith, shall conclusively be deemed to be a part of the expenses of the committee; and these expenses, it is otherwise provided, shall be paid out of the proceeds of the road if the committee thinks proper.

The agreement constitutes the committee as trustee of an express trust, with legal title to all of the bonds, coupons, and funded interest notes which may be deposited. It is empowered to take all proceedings, legal or otherwise, as to it shall seem necessary or proper; that it may transfer the deposited securities to itself and its own members, or to any other person whom it may designate; that it may execute such papers and do such act as the committee shall consider judi-

cious or proper; that it may demand, collect, or receive the interest for all the deposited securities; that it may elect to have them declared due and payable; that it may withdraw or revoke any such election; that it may exercise control over any suit or proceedings instituted, in which the holders of any class of deposited securities are, or may be, interested, whether by foreclosure or otherwise; may consent to the appointment of receivers, for the removal or substitution of receivers; may consent or oppose the issuance of receivers' obligations, and may, if the committee deems it advisable, consent that the lien and security of all obligations or certificates be superior to the lien of the first mortgage, or to any securities held or pledged thereunder, upon or in respect of all or any property covered thereby or subject thereto, and in general may do whatever the committee in its discretion may deem judicious and expedient in order to carry out fully and effectively the purposes of this agreement.

The agreement further stipulates that the committee may at any time and from time to time, at public or private sale, purchase or cause to be purchased, or may contract to purchase, or may in any manner acquire or cause to be acquired, at such price or prices as the committee in the exercise of its discretion deems expedient, all or any of the property at any time subject to the first mortgage or the lien thereof, all obligations of the defendant company, all certificates of indebtedness issued by any receiver or receivers of the railroad company or of its property; but the committee shall not be bound to make any such purchase or contract to purchase.

It is further agreed that the committee at all times may exercise the rights of an absolute owner as to all the securities and property acquired by it, and may, in its uncontrolled discretion, sell or transfer the same upon such terms as it may deem proper.

It is further stipulated that the deposited securities and all the proceeds thereof shall be charged with the payment of the compensation of the committee and its expenses, the compensation and expenses of the depositary, and counsel fees and all the indebtedness, obligations, and liability of the committee. All the cash it may receive may be applied to such compensation, for expenses, or otherwise, as the committee may in its discretion determine to be necessary or advisable for the purposes of this agreement. Again, that it may borrow money at such terms and at such rates of interest as it may in its discretion determine, and pledge all the property and securities as securities therefor. Other than that, it shall have the power to fix and adjust the respective rights and interest of the bondholders, the relative rights, preferences, priorities, and distinctions to be accorded to each class of the bonds, to give effect to such determination, and to apportion thereto such amount as the committee may in its discretion determine to be just and equitable, and power to penalize the bondholders who do not enter into this agreement may be found in the following clause:

"The committee shall have full power and authority to fix and adjust respective rights and interests as between the holders of the bonds, and of such classes as may not have made the cash contribution provided for; to determine relative rights, preferences, priorities, and distinctions to be accorded to such holders; to give effect to such determination, and to apportion, as between the

holders of the deposited first mortgage bonds, of each class who have and who have not made said distribution, upon any distribution of securities, cash or other property, or under any plan of reorganization, as the committee may in its discretion determine to be just and equitable; and the committee may provide for the forfeiture of all the interest in or under this agreement, in or to the deposited securities or any proceeds thereof or substitutes therefor, by any depositor who shall not, within the period limited, comply with the, terms imposed by the committee."

The committee may enter into a contract for the sale or exchange of the deposited securities at such price as they may think proper, if consented to in writing by depositors representing two-thirds of the amount deposited; that such contract shall be filed with the depositary, and shall become binding on all depositors, all of whom shall be conclusively and finally deemed, for all purposes, to have assented to said contract, whether they have received actual notice or not. The committee is given absolute discretion to prepare and adopt a plan for the reorganization of the railroad company, which may, in their judgment, provide for the sale or exchange, or resale of the same, at such price and under such conditions as they may deem proper. They may buy other railroads, which, in the opinion of the committee, may be advantageous. They may raise any sums in cash they may deem necessary for the purposes of reorganization, may constitute managers of the reorganization, and provide for their compensation and expenses. It is noteworthy that the members of the committee may act as such managers, and may make provision for the payment of the compensation and expenses of the committee. Whenever the committee shall have prepared or approved such a plan, it shall be filed with the depositary at its principal office in the city of New York, and a brief notice, the character of which is not indicated, or the length of time, shall be given of the fact. This shall be done by publication, and shall be conclusive on all.

Any depositor may withdraw from the agreement by the payment of an amount which the committee, in its discretion, may fix and apportion. The committee may, at any time, fill a vacancy in itself or may add an additional member or additional members, who shall have all the power and rights of the committee; but, if any committeeman should die or resign, the vacancy need not be filled. The committee may act for the majority of its members, either at a meeting or without a meeting. Any member may vote or act by proxy, which proxy may not be another member; and the vote or act of such proxy shall be as effective as the vote or act of the member appointing such proxy. The committee may limit or extend the time and fix the conditions under which deposits may be made under the agreement, and may impose penalties upon belated deposits; but, generally, and in special instances, may in its discretion accept such deposits after the time thus fixed has expired. The committee shall have the power to employ such depositary's counsel, attorneys, agents, or employés, which, in its judgment, shall be necessary or useful, and shall be entitled to a reasonable compensation for its services; but the committee is careful to state that it shall not be liable for any act or action of such

agent of employé, or any error of judgment or mistake of law, nor for anything other than its or his own willful malfeasance.

The depositary, in all things, shall be subject to the direction of and responsible to the committee alone. No member of the committee shall be liable for the act or acts of any other member or for anything but his own willful malfeasance. It is especially provided that any member of the committee or any firm or corporation of which he is a member may become interested in any or all of the property subject to this agreement, and in any plan of reorganization. Any of them may be an officer, director, or stockholder for the depositary; and its officers, directors, or agents may likewise become interested and may buy or sell certificates of deposit and undeposited first mortgage bonds, etc., on the same footing as any other depositor; and the committee is given imperative and absolute power to construe the agreement, and its construction made in good faith shall be final, conclusive, and binding upon all depositors.

The committee may make such modifications in the agreement as in its judgment may be expedient, and such judgment as to such expediency or efficiency shall be final. It may amend the agreement and may confer upon the committee additional rights and power, although such rights and power are not contemplated by the agreement. After such increase of power, any depositor may withdraw from the agreement provided he pays such an amount as the committee may in its discretion fix. For such increase of power not originally provided for, there shall be publication for the period of 15 days, and, if the depositors do not withdraw in that period, they shall be conclusively presumed to have assented to such increase of power, whether they have received actual notice or not, and shall be irrevocably bound and concluded by the sale.

The committee in its discretion at any time may ask to cancel the whole agreement and terminate the same, in which event the depositors shall be entitled to the return of their securities if, under the gigantic powers otherwise provided, the committee has not already parted with them; but they shall not have this privilege unless they pay their proportionate share to be fixed in the discretion of the committee, of a sum necessary for its compensation and expenses which they may have incurred under the provisions of the now abortive and abandoned scheme. The receipt of a depositor under such circumstances, or what the committee may apportion him, and the surrender of his certificate and deposit, shall estop him from making any objection to the correctness of the accounts of the committee, and shall constitute a release and discharge of the committee, from any and all accountabilities and liabilities whatsoever to such depositor or depositors. It expressly stipulates also that, in the enumeration of the special rights or powers in the committee, shall be construed to limit any of the general provisions of the agreement. "The Commercial and Financial Chronicle," published in the borough of Manhattan, and any other magazine, periodical, or newspaper published in the city of New York, or elsewhere, that the committee may determine upon, may be the offi-

cial "organ" of the committee for the publication of any notice made necessary by the agreement. Any notice so published shall be considered as though personally served, and such publications shall be the only notice required to be given under this agreement or under any of its provisions.

The committee stipulates that it is not under any obligations, legal or equitable, expressed or implied, to any bondholder who shall not deposit his bonds hereunder, or to any other person whatsoever, other than the depositor.

The plaintiff, the holder of $6,000 worth of bonds, the price of which were used for the construction of the railway property, which constitutes the sole value in the nature of his security which this agreement enables the committee and its coadjutors to administer and appropriate, was in no sense a party to the agreement. He knocks at the door of this court and asks protection against this most astonishing arrangement for the dissipation of his rights, and the defeat of his remedies. The agreement is one which enables a few persons of financial acumen and means to draw to their management and, if necessary, to themselves, all the values which have been invested in this project, and all the chances of its prosperity. It empowers agents who are authorized to sell the property to buy it for themselves, or either of themselves, at public or private sale. It usurps all the powers of those courts, the agents of that established justice which the Constitution provides. There have been many such schemes in the past. The learned solicitors of the respondent declare that they are of everyday occurrence. If this be true, so much the worse for investors and for American constitutional justice. They have never had and will not have any encouragement from this court.

The plaintiff's interests are, in the minds of the defendant company, and its solicitors, ludicrously small. They are, however, entitled to protection here. The property itself which may become invaluable to the state and to one of its best seaports is here. Upon that property the plaintiff, as bondholder, has an equitable lien. The depositary and the committee are not citizens of Georgia, and are not before the court; but their scheme, as set forth in the agreement, is undisputed, and it is made plain that a majority of the bondholders have assented to it. It therefore threatens the value and effectiveness of the plaintiff's lien.

[2] The presence of the committee and the depositary as parties at this preliminary stage, while proper enough if they choose to appear, is not indispensable to the jurisdiction of the court to grant the extraordinary remedy sought. They may appear if they think proper, or, before final judgment, they may be made parties by the usual procedure in such cases. In our judgment, we should protect, if we can, the right of this plaintiff to enforce his mortgage lien upon this property, and the property itself. Under the circumstances, this can be done by the equitable levy resulting through the appointment of a receiver or receivers.

A decree may be taken accordingly.